17-2883, the state of Oromo and Zimmon. Good morning. Can the attorneys on Zimmon please approach? Good morning. Yeah. All right. Counsel for the appellant? Good morning. Can you identify yourself for the record, please? Charles Kogut, K-O-G-U-T, and Daniel Kamensky on behalf of the appellants here for the University of Jerusalem. Good morning, Your Honors. Susan Booker on behalf of the appellee, Norman Zimmon, in his capacity as executor of the estate of Ahma Zimmon. All right, Ms. Booker. Mr. Kogut, did you want to save some time for the rebuttal? Yes, Your Honor. How long? 20 minutes for the argument? 15 and 5 should be fine. Great. All right. Thank you very much. Ms. Booker, you can have a seat. Mr. Kogut, go right ahead. Thank you. Please, the court, counsel. In determining whether a will is a joint mutual will, as we have in this case, each case must be decided on its own facts and circumstances. The primary focus of the court is to determine the testator's impact on the document. In doing so, you look to the language of the will, and you must look to the document as a whole, not to dissect its individual sections and then analyze the paragraphs unrelated to each other. And in this case, you know, in dealing with the facts and circumstances, you look at the relationship of the decedents and their family. They had no children. They had no direct descendants. All they had was collateral damage. They executed a mutual last will and testament in January of 83. And in the document, they did provide for their respective families. It just wasn't for the entire residuary estate. In the mutual will, it was 60 percent to charities, 40 percent to their respective families. 30 and 10, not equally, but they did provide for both. And in addition to that, what's important to know is they did express why they were leaving it, and they further expressed their desire to be memorialized for that generosity. And the will was our generosity. There's no issue as to the will containing multiple plural pronouns throughout the document. So when you can, looking at the will as a whole, it does have all the common characteristics that have been dealt with over the years in all of the cases, including the Supreme Court cases. And when you consider all these facts, the will evidenced a pre-designed arrangement between them to benefit the legatees under their 83 mutual will. That is, they had an agreement to do so. I'd like to address first the main points that the estate raises in its brief. One is that the court must look, take a two-step process. One, was there a specific reference to an express agreement or a reference within the will to an express agreement? Was there? No. Okay. There was not. All right. But there's absolutely no requirement that you do so, you know, to find a will to be joint mutual. The case is Bonkowski. Now, even Rausch v. Rausch, the principal case the estate relies on, states that there is no requirement to make an express contract or a deferral contract in the will. The will itself may constitute and comprise the contract. But in earlier years, like before 1947, there was like almost a presumption that if a husband and wife executed a will, there was already an agreement. It was the marriage that was under the considerations that were made for it. Well, that presumption has been diverted over the years. Right, it's gone. It's gone. But you still move to the common characteristics and the provisions and the intent gleaned from the provisions of the entire will. And the second point I think the estate argues is incorrect is that they argue, well, the will must have shown some separate consideration going between the testators to support the contract under a joint mutual will. There is absolutely no necessity, as stated in the Edwards case, that the survivors obtain a material gain as a result of the agreement that's contained in the document. The mutual love and respect is sufficient consideration to support a joint and mutual will. And that is in all, including Rausch, which the estate relies on, the Supreme Court case of Curry v. Cotton, Mankowski, Edwards, and the Swarovski case, which is this Court's opinion. So in here, you now focus to the, you know, there's no reason to have an express reference to a contract. There's no requirement to have a separate written express contract. And there's no need for separate consideration beyond being bound by the terms of the document itself. So now we move to the characteristics of the will. In here, in applying all the principles that have been set out in all the cases that both sides have cited in the case, under Illinois law, resilience, mutual last will and testament, does constitute a binding and enforceable joint mutual will. It meets all the requirements that all the courts have looked to. And it's the presence of these factors within the will that establishes the validity of joint mutual will by clear and convincing evidence. And that's what Rausch states. Again, the principle case relied on by the estate. So the report is clear and convincing. No question. Well, if you find all... What's the shorthand description of that, Horace? Clear and convincing. What's the shorthand description of what clear and convincing proof means? It's not. It's higher than preponderance, less than, beyond the reasonable doubt. So that's the way I've always learned. I'll never step forth in a case. But if you look at the Rausch case, it says the existence of these five, and about those five characteristics, clearly establish that the testators in that case intended to make a binding joint mutual will. And you've already indicated, though, that one of the factors is definitely not present. Any language suggesting an agreement or a covenant in this case. That is not a requirement. No, it's one of the factors to consider. No question. I mean, if you have an express... And that language is missing. Yes, there is no express reference to a covenant. And then is there a provision where each one is giving to the other exclusively forever without any limitations? Isn't that language in this? It says use and benefit forever. Forever. In this will. Okay. And that's the common... Does that help you or hurt you? Well, again, if you look at all the cases that are cited, they have cases where that very terminology was exuded. They use the case that say absolute fee simple. But forever isn't really like that? No, America, in the Swarovski case, it was the exact language that this court, the first district case, 66, I believe it was in the 60s, held that that language, and look at the rest of the terms of the will, only meant that the testator, the surviving testator, had the use and benefit of the property during their lifetime to use as they see fit. However, upon their death, whatever is left over goes to the legacies under the will. Is there anything in this will that has a gift to a corpus so that everything is going one place or divided equally between their heirs on his side and her side? Okay, if there is the reciprocal provisions under articles 2nd and 3rd, and 1 is for the... Then the actual gifts. The 5th article. The 5th article, yeah, and it's important to know in the language of article 5th, they say, you know, after the survivor's death, we give our estate, not estates. It's a singular terminology as to their assets. And from the prior paragraph under the will is a direction to the executors that upon the survivor of our death, we direct the executors to sell all our property upon the survivor's death, and then, you know, then you go to paragraph 5. Paragraph 5 says after the payment of the death and all that, we give our estate as follows. And it goes... But she carves out some things, doesn't she? Her jewelry and... In the current case, that's not a relevant issue to destroy a common dispositive scheme. So, and again... Well, it's a common dispositive scheme where the parties essentially provide for others equally or in some kind of... I don't know. Do you understand what I'm asking you? Some of her relatives are getting certain portions. His aren't as much. Is that true in this particular case? Yeah. I think in the H.R.E. will, Dr. Simonson is given 10%. Alma's brother, sister, or brother's kids are 20% or 30%, 10%, then 10% to our 50% plus for the Hebrew University. So they aren't treated equally, but they are considered. I think that's important. Because that goes to the intent of what they wanted to do. The estate's basic... I'm maybe jumbling out my argument now to answer your question, but the estate's argument is that in common dispositive schemes, you have to leave it to your relatives equally on either side. If they didn't intend... It's their intent to do so that makes a joint mutual will of binding contract. That's the estate's argument. I think what the court has to consider, look at what Alma did with her trust years after her husband passed away. She has an excess of $5.8 million estate. She gives less than... My math may be off, but approximately 7% of her estate to family, with the rest to charity. So the estate's argument, if they intended to join a mutual will, then there's divided up among their family equally. That violates the primary focus of what this court's to do, is to give effect to what the testator's intended. If she intended to give it to her family, she would have done so. The fact that she left 90, whatever, 3% of her $5 million estate to charity shows that she never intended to benefit the family. So why should this court impose that obligation when the will itself, looking at all the terms, expresses their intent to benefit Hebrew University in particular, and the reasons why they want to benefit the Hebrew University. I think the most comparable case to this situation is the Edwards estate. There, they specifically mention they had relatives, and they expressly excluded them from the disposition of their estate. And the court still found that that represented a common dispositive scheme because they expressed their desire of why they were doing it. That case was from 1954, wasn't it? Correct, Supreme Court case. And that was when there was still a presumption. No, no. The court in Edwards specifically notes that they recognize the prior presumption that used to be in existence just between an execution of the will or a joint will between husband and wife. So Edwards recognized the prior presumption that used to be commonplace, and they recognized the fact that that's being diluted. So then they went to look at the terms of the will itself to rely on what the testator's intent was, not the diluted presumption that formally exists. So in Tyler Edwards' case, that presumption is not reliable. Now, I wanted to make sure the court … Your Padawan wants you to address something. No, it's the exact quote out of Edwards' case where they bring up the fact that the later proceedings, however, appear reluctant to make a presumption vis-à-vis and other stuff. That's the subquote. So Edwards did recognize. They made sure, okay, we're not going to rely on this presumption anymore. We are going to rely on the terms of the will itself. And that's when they recognized they had a pre-designed arrangement to benefit, in that case, Myrtle and Lou, their long-time caregiver, and expressed why they wanted to do it because of her care. Just like the Zivins did in their will. We specifically want to benefit the students in Israel, and that's our motive. And we want to memorialize her. It's like, you know, whatever. We want to give you money. So that was there intact. And I think the court, if you look at this will, and compare it to the provisions of the Edwards will, it's almost the most familiar or identical situation to what we have here. I know there's not – for all the cases that we've cited, both sides in our briefs, you can't find a will that comes close. In these cases, that matches what the Zivins did here. And it's kind of a hybrid with they did comply with at least some of the requirements to give to their family, just not equally, and just not all of them. But they did remember. So I think that kind of takes it to the fore. So they did include this in their common dispositive scheme. And again, in the case of Edwards, Curry v. Condon, even the waiver state that's here, that in most cases the courts upheld joint mutual wills where the families weren't treated equally. So if the state's position is correct that Rauch now demands a definite splitting of assets among the family, those Supreme Court cases would have to be overruled. And that's not what I believe Rauch did. Counsel, let me ask you a question about paragraph 5th. That's where the request to Hebrew University is, right? Right. I'm not totally sure I'm quoting this verbatim, but I believe it begins by saying, in the event we shall both perish in a common disaster, we're following the death of the survivor of us. That's saying after both of us are dead. Right. It's not saying what happens if one dies and the other lives. Paragraph 5th is talking about what happens after we're both dead, presuming that nothing has changed in the interim. For example, another will that says this will is no longer valid. Right. I don't think you're interpreting the terms of the war right, because in the second and third it says we give to each other, okay, for use and benefit. Then we sell, then the next provision is we direct our executives to sell everything upon the survivor's death. And in paragraph 5th it says, they didn't die in a common disaster so that's not relevant, but following the death of the survivor, we direct and give our estate to these legatees. So it does apply to, you hold it during your lifetime under the second or third derivative, whoever survived, either Alma or Dr. Ziven, but upon the death of the survivor of this is what we are going to do. We direct our executives to sell, and we give our estate this way. So I believe to answer your question, no, this is what happens. The terms of this will follow upon the death of the survivor. So the only point of saying that is to say it's not going to happen while there's a survivor. Right, because the surviving testator has the use and benefit of the property during their life. It's only when the death occurs that the contingent benefit here is under article 5th come into play. What language in here would, I mean the point of you arguing it's joint and mutual is that once the first person dies it's locked in, right? Correct. That is correct. That is correct. What language in here, I know there's a test, but what language in here suggests that that was the intention? The use of the plural pronouns throughout the document I think is very important. That certainly indicates that at the moment they're signing this, this is what they want to do. Right. Okay, I'm with you. And at the time they sign it, it's based on a pre-designed arrangement between them to do it this way. It is a contract. I'm not sure it means that, but it does mean that at that moment this is what they both want to do. Presumably they're both in agreement on this. So I use we and our and they're my. Right. Not my actually. We and our, plural pronouns. Right. But that's different than saying you can't change your mind. That when one of us dies, everyone can't change their mind. Or that we can't both change our mind. Could they both have changed their mind and ripped up this contract? On notice of each other, as the case law says, yes. Yeah, I assume they could, right? Once one dies, you're saying that this language, I mean these titles are all nice, these doctrines are all nice, but what in here says if the first one dies, the survivor is stuck with these terms? There's at least one place in here where it says if the wife survives, she can change the distribution of the jewelry and things like that, right? No, it doesn't say that. It says if. Something like that. I may be. There's no provision that changes it upon the survivor's life. Okay. But again, there's no specific point, to answer your question, within this document. That's why you can look to the factors that have been recognized by the courts that are included in this document that give rise to the joint mutual will, which makes it irrevocable. The court misquotes opinion on this very case, which originally was up on appeal a while ago, that make notes on the case law that says once this is done, and this is deemed to be a joint mutual will, you're locked in. Once the first one dies, that's it. I think even. . . Right, but our question is, is it a joint mutual will? Well, that's what we're here for. And, but without, you're asking, is there a specific language, is there a specific reference to express agreement in this document? No. Does it refer to an express agreement in this document? No. But as I said earlier, there is absolutely no requirement under Illinois law that this document make those expressions. Is there anything that says it's irrevocable? No. You're talking about like the Signori standard that would have a provision in there that says we can revoke it at any time? No, that's not in this one. But, again, that's the. . . The cases at least suggested that when you have something that says we covenant or we agree, that that is an indicator. That's one of the factors, and under the facts and circumstances of the case, that would lead the court to reach that conclusion. And I also want to note that they use the word mutual in this document. They don't use joint mutual. Well, by operation of law, it's joint because it's one document executed by two people. So by operation of law, it is a joint document. Well, it's important that they use the word mutual not only in the title but in the opening and subsequent paragraphs in the document itself. And in this court in Kaplan, we're never looking at whether that rule was a joint mutual. That didn't have all the elements that are the common characteristics. But the court stressed in some places, we were looking throughout the rule for the word mutual. So Kaplan Court was giving that word a significant emphasis to determine whether it was pursuant to a contract. And here we have the word mutual not only again in the title but in the body of the document itself. So answer your question, Your Honor, it doesn't have that specific word, but the factors that are in this will give rise to the fact that it was a joint mutual. And that was intended. . . You're saying it's obviously joint. It doesn't need to say the word joint because it's obviously joint since they're doing. . . I think, I mean, but in the Senate, in our brief, the gospel is, no, look at Vankowski. You have to have the document say joint mutual. Vankowski said last combined will of destiny. Never use the word joint mutual. The importance of Vankowski was if they were a combined document, it was a mutual document. That's what this will says. It's a mutual document. Okay. So I think that's. . . Okay. And then on the other main findings, the pool answers, I think Justice McBride brought that up. And when you look at the whole document, the faculty used the word use and benefits forever, did not give an unfettered right. The case in Lee's side also had a huge paragraph of what the survivor could do with their body, sell, dispose, whatever, but it still did not give a fee symbol. It said, you know, it's used only during your lifetime and what's left must go according to the terms of the will. Ross even had absolute property to each spouse. They had the will to be joint mutual, and that was a pooling of assets. Hell, absolute property forever. So, I mean, you did it with an I.U. for an absolute fee symbol with a use and benefit forever. So, again, like the cases that look at this, when you read the will as a whole, that does not give an unfettered right to the survivor to dispose of the property as she sees fit. It is required to follow the terms of the joint mutual will. The way it was touched on already, there's no dispute that the will has a plural use. Yeah, you're going down 25 minutes now. All right. Let's wrap it up. All right. At this point, I would think that the factors of the court recognized that this is a joint mutual will. It's binding. It's enforceable. I think the trial court's determination that it didn't have factors not necessary with the contract was an error. We would ask the court to find that this is a joint mutual, remand the case back to the trial court for further proceedings if consistent with the subpoena, and reverse the trial. Thank you. Thank you, Mr. Cook. Ms. Booker? Good morning. Your Honors, Alma Zivin died. A will dated May 2004 was admitted to probate. On the day the claims period would have otherwise expired, Hebrew University of Jerusalem, which I will probably refer to as HUJ, filed a claim against the estate, and the claim was for breach of contract. And in connection with that breach of contract, HUJ sought to enforce a will signed by Alma Zivin and her husband in 1983, which I'll refer to as the 1983 will. And that's the will that Your Honors have heard about this morning, and I'd like to know a few things about that will. But before I do, the trial court looked at the 1983 will, and consistent with its obligation under Illinois law, it looked at that will solely within the four corners of the document. Because as we've all conceded, there was no other evidence presented, there was no other contract attached, there was no testimony. The court was limited to the four corners of the document, just as this court is limited. So to the extent that counsel referred to Alma's trust, that's far beyond the four corners of the will and not relevant. What this court has to decide is what did that document create or not create. And joint and mutual wills are contractual in nature. That means there has to be a contract by which the parties agree that the surviving spouse cannot revoke the will at a later time. Your Honor, I believe it was Your Honor, asked what the standard was. And I would like to offer that the clear and convincing standard is that quantum of proof which leaves no reasonable doubt in the mind of the trier of fact on the truth of the issue. And that comes from N. Wade Ray Weaver's estate, which is cited in our brief. Counsel then referred to this 1983 document as a hybrid. Well, is that clear and convincing? I would suggest it's not. In listening to counsel's arguments and in briefing this, I recall when I was a little girl and we would go out for Chinese food and you could order a family dinner. And you could order one from column A, two from column B, and three from column C. And you would call those pieces together and you would make your dinner. Well, here what counsel is arguing, and I agree,  or republished in any of the cases just like this document. So to say Edwards applies really isn't consistent because in Edwards the distinction was that there was a life estate left to the survivor. So let's look at what the 1983 will did and did not do. As Your Honor has noted, there's absolutely no prohibition on revocation. And it is the contract within the joint mutual will that renders the will irrevocable. So there's nothing in here to indicate counsel conceded. It doesn't say it can't be revoked. And there's really no indication that it was not revocable because among other things the property was left to the surviving spouse for his or her sole and exclusive use and benefit forever. Forever. They got it forever. And what the will provides is later on is when the second dies, if there's anything left, then maybe it's supposed to go somewhere. But that doesn't create some sort of an irrevocable document. It's certainly not a contract. It also, by virtue of that provision. So what would you have expected it to say? You write. It says, okay, if the husband dies, the wife has that for her benefit. It doesn't. I mean, of course it says that, right? So that means, yes, she could spend all the money, right? She could spend like a drunken sailor and dispose of all the money and die with nothing. But that's always true. The question is, I mean, isn't it? Why is that a meaningful point? It's meaningful because in so many, so many of the cases that led up to Signore and even in Signore, the courts found that the document limited the spouse's use. The spouse could use it for her lifetime, but she couldn't sell any of the real estate that existed. And I apologize. I can't pull all the case names out there because there's so many of them. But there absolutely can be a limitation. In fact, this will shows you that the scrivener knew how to limit the money because the bequest that would go, if this was an enforceable joint mutual will, to HEJ provides for income only. The assets don't go outright to HEJ. So this scrivener knew how to limit the use of the assets, and he didn't. Alma got it all outright forever. And the courts have consistently upheld that to be a factor that would negate an enforceable joint will, except in a certain number of situations, which counsel touched on. And that's this concept that where the will provides for the beneficiaries of each spouse, usually or often in many of the cases, the couples had children from prior marriages. And so when the draftsman of the or when they sat down and drafted their will and said, listen, we want to make sure each of our kids gets their share of the money, even if it went absolutely forever and always, the courts overrode that on a policy grounds that family settlement agreements should be upheld, and that given that bequest to the children in equal shares, the testators could not have intended to really create a life estate. That's what happened in Helms, and that's what happened in later cases. You don't have that here. You don't have anything remotely like that here. What you have is a bequest to two charities, which Alma was free to change if she wanted to change, again, because the assets came to her, and again, because there was no limitation on revocation. The importance of the language used is noted in the Larrison court. It's a Supreme Court case. And in that situation, the court found that where an estate goes in fee simple, which is what we have here, there's no enforceable joint and mutual will. Edwards similarly – I'm sorry. Can you explain what you just said? Say it again, please. In Larrison. Larrison? Yes. It's cited in our case. It's a Supreme Court case. It talks about this language. And again, in our will, the 1983 will, it's to his or her sole and exclusive use and benefits forever, which we maintain is fee simple. In Larrison, the language was his or her sole and absolute property forever. In Larrison, the Supreme Court noted that that is fee simple. And I don't know if it was Larrison and or other cases, but there has been the – I'm sorry, it's Platts v. Waltz, 1954, Illinois Supreme Court. When the word absolute is used, it would require a great clarity of expression in a later clause to cut down the device to a life estate. In this situation, we don't have absolute, but we have use and benefits forever. There is no subsequent language. There's no language in the document that indicates that the testators meant anything other than a life estate. So under Signore, if the wife is not – or the spouse in this case – the wife is not limited under her disposition of the assets, how can there be a contract not to revoke? And it's key, that contract concept. We are not saying that, again, that there has to be a contract separate out there, but this document does not have contractual language. It does not have contractual language that renders the will, the 1983, irrevocable. Alma could do what she wants. That's what the trial court found. And we think that that was obviously the right decision. Where do the factors, these Roush factors come in? The State would offer this Court that these factors are all indicia of whether there was a contract to revoke. So it's not that you can have the factors and no contract. It's all the totality of the circumstances, the totality of the document. And, again, we believe that the Court found it properly. So, counsel, just to make sure I understand this, so if this were a joint mutual will, if it were the opposite of what you want us to find, you would say that there would be language in there that would have limited the surviving spouse in their use of the land or the property? Yes, because you would have to preserve that property for the remainder. Prevent them from selling it all off or spending it all. Absolutely. And there are cases where the Court has looked. Again, I apologize, there are so many cases. But there was at least one case where the son came in seeking to enjoin his stepmother or I think it was his mother from acting contrary to the will which provided a life estate. A life estate, again, is all you get is to use those assets for your life. And in this case, we don't know what their property was. We don't know if it was real property. We don't know if it was personal property. We do know that Alma had some very nice jewelry. But beyond that, we don't really know what the property was. But Alma was allowed to do with it what she wanted. And this concept of consideration, Your Honors, I think it's a red herring because there's no agreement for which there's consideration. And Your Honor was correct. This presumption has long since faded away. And the case standing in this district right now is the Signore case, which really calls all of these previous cases and takes these factors and summarizes them and adds to the Roush factors. And we're really relying on Signore because Signore adds the context of revocability and the life estate, both of which are key to finding a contract. So I'm not sure that there's much I can add to Your Honors. I have lots of cards here. But if you have any other questions, I'm happy to answer them. Otherwise, we would ask that the Court affirm the trial court's order and that we proceed from there. Thank you so much. Mr. Colvin, a brief rebuttal? Briefly. First of all, whatever the trial court determines, this is a denotable review. So whatever analysis Judge Coleman made really isn't binding on this court. But when you look for a common dispositive scheme, you look at the whole document, all the language in the document, and you find what their intent was. And I get back to Alma's subsequent trust. Counsel says, well, that's irrelevant. But this is a fact and circumstance that exists in this case. And, for example, wills that are challenged for new influence. Prior consistent wills over a length of time were admissible to show what the intent of the deceit was. Here I think it's Alma's bequest under her wills of the Cherries, excluding family, is relevant to determine what their intent was at the time this will was done. So it is, I think, very relevant. As far as Sidnori, that case has been distinguished by, because in that case there was a specific reference in there that the testators could, they did have the right to revoke this joint will. So anything that's in the opinion prior makes a note of that. And in Kaplan, that case doesn't apply. Counsel brings Weatherson v. Record, which was cited in their brief. That also is not applicable because in that document, I believe there was no provisions in there for what happened with the estate after they died in a simultaneous event. And the court held there's really nothing to decide. We can't. Does it have to say it's revocable to be revocable? No. Does not. Doesn't that mean that this was revocable? It doesn't have to say it's revocable to be a joint mutual will. So I'm not sure if I understand your question. This will has nothing that says it's revocable. If they can revoke it, correct. Does that mean they can't? There's no prohibition on revoking it, right? There's nothing in there that says it's irrevocable. No, there's no reference either way when you apply it. So which way is that cut? Does that mean it's revocable or not? Not when you apply all the factors that the court's looked at and say that this is a binding contract, and it is a binding contract. As the similar opinion we cite in the prior case. Okay. What about the fact that she could have disposed of all the money during her life? Do you agree with that? Yes, I do. In fact, the Swarovski case from the First District specifically states that you have the unfettered right to use the property as you see fit, but whatever remains goes according to the rule. So if Alma, as you say, was a drunken sailor and went out and spent everything, it wouldn't be here. No disrespect, my House. No, I understand. It's not a disrespect in your court. Yeah. But the fact that she had $5.some million left when she died, whatever was left after her use and benefit of the property, not the simple, not absolute, must follow the terms of the will. But it was forever. When she died, that ends forever, Your Honor. I don't know how else to put that. I don't think it goes beyond that. And Jackson Lane, by the way, was in the Swarovski case, used and benefited forever. And they said, you only get to use it during your lifetime, but that's whatever's left over goes to the will, under the joint mutual will. So I think this document does express a common dispositive scheme when you look at what their express intent was to benefit HEJ and the fact that it was in trust, but not still a benefit for them. And they are entitled to enforce the contract that was entered into by the Zivins and pursue their damages in the trial court. So thank you very much. Thank you, Mr. Cooper. We'll take a minute under advisement, issue a notice as soon as possible. Thank you, Your Honor. Court is adjourned.